Your Honor, this case is Morning Call, 218-0653, People of the State of Illinois v. David Twining. On behalf of Mr. Twining, Ms. Constance L. Augsburger, and on behalf of the people, Ms. Erin Hensley-Connell. Ms. Augsburger, you may proceed. Good morning, Your Honors. It's a pleasure to be here today. I haven't had the opportunity to argue in quite some time, and I worked here a long time ago. And the only familiar face to me is Judge McLaren, Justice McLaren, and it's a pleasure. Although, it makes me nervous, too, because I know Justice McLaren always makes me dance, so that's fine. Today, I am here on behalf of Mr. Twining, who was adjudicated as a sexually dangerous person in 1995 in Ogle County. I pulled out all the stops in my brief in chief, and then again in my reply brief, so there isn't really anything to add to my written argument other than to highlight certain things. I know the Court is generally familiar with the facts. I would point out to the Court that it's terribly important, from Mr. Twining's perspective, that the Court pay specific attention to the proceedings that occurred in 2002. At that time, he had filed a recovery application, and it was granted. And that is the supplemental record. Judge Steve Pemberton presided at that time. Doug Floskey was the state's attorney, and John Reddington was the appointed counsel for Mr. Twining. And Dr. Mark Karich, who had been the director of programs at Big Money, was the person who signed off on the report. So I do really refer your honors to look at the supplemental record, because it's our contention that in 2002, Dr. Karich was right, and Judge Pemberton was right. And state's attorney Floskey was right, and court-appointed counsel attorney Reddington was right. But his conditional release was revoked. Yes, it was. Oh, and it was a conditional release, right? Correct. And what relevance does what another doctor found some years earlier have to do with his condition in 2016? A lot of relevance, actually, Your Honor. But the jury did not hear that, correct? No. No attention was paid to the 2002 proceeding at all. Dr. Clunch, who spoke on behalf of the assistant attorney general, said he thought he'd read it, but he couldn't remember anything about it. And unfortunately, Mr. Twining's court-appointed counsel didn't refer to it at all either. The relevance of it, Your Honor, is this. While his conditional release, you're exactly right. He was found not to be no longer a sexually dangerous person. It was impossible to tell is what Judge Pemberton was going on, and he went under that portion of the statute where he had the discretion to offer conditional release. And the conditional release had about 17 different conditions. It was a very long order. It's in the supplemental record. And Mr. Twining was revoked. His conditional release was revoked in 2013, but not because he committed any sexual offenses. It was because he abused alcohol. He admitted to that. He abused cocaine. He admitted to that. He also admitted to not being particularly compliant with some of his counseling requirements. It's not correct to say that from 2002 to 2013, he committed any sexual offenses of any kind. Dr. Clunch did argue, and I submit. Well, he considered the prostitution relationships or paying prostitutes as a quote-unquote sex offense. Yes. And I think that that was inappropriate. Dr. Clunch wasn't hired as a legal expert, and that was inappropriate for him to discuss it. And also, Judge Pemberton didn't revoke the probation because of that. Excuse me, I think that was Judge Hanson at that point. His admitted use of prostitution, of prostitutes, was not included in the order to revoke. The three reasons he was revoked was his cocaine use, admitted, his alcohol use, admitted, and his lack of some compliance with his counselors. So, again, I submit Dr. Terich was right. Judge Pemberton was right. Even the State's attorney was right. The State's attorney, Doug Flosky, said back in 2002, Your Honor, you can't look at this information from Big Money and say that this person is no longer a sexually dangerous person. At that hearing, that was essentially a stipulated bench trial, correct? They stipulated to the report. Yes, they stipulated to the report. There was no actual testimony, correct? Correct. So the trial court did not have an opportunity to weigh the credibility. It just looked at the report and accepted the report as conclusive that the defendant was no longer sexually dangerous, correct? Well, actually, Dr. Terich didn't say that. Dr. Terich didn't say Talk about the court, what the court did. I'm sorry. The trial court's determination. The trial court did not determine he was no longer sexually dangerous. The trial court took the middle ground and said it's impossible to say, and so he's going to be released on conditional release. And I would submit to you, Your Honor, Dr. Terich wrote the report at that time that is analogous to the report that Dr. Clunch wrote in 2016. Mr. Reddington did not ask for another report. So there wasn't an opposing report. There wasn't a report that said, oh, no, he's no longer sexually dangerous. There wasn't anything like that. The judge had the very best information that could possibly be had. Can we talk about the actual evidence in this particular recovery decision? Sure. In the current case, well, actually, I'd like to address my last point first, if you don't mind. I am asking the court to return the case to the trial court with directions that Mr. Twining's motion for judicial review of care and treatment be reinstated. Because at the hearing, at the end of the hearing, without any discussion, without any request, without any suggestion, it was simply ordered withdrawn. And I know that the state has argued, well, the record is silent there, so that should count against Mr. Twining. The record is silent there because there's no record to have. Every bit of record that exists has been produced to the court. And unless the court wants to think that the court reporter, Angela Miller, wasn't telling the truth when she certified the accuracy of the proceeding, then the court has to know. Excuse me. I refer the court specifically to R462 and 463, where Judge Hansen said, we're outside the presence of the jury. At this time, I'll direct Ms. Snow and Mr. Glendon to prepare a report. He continues to talk. He starts admonishing Mr. Twining. Then he says, do you understand your appeal rights? Yes, Your Honor. Any questions? No, Your Honor.  Let me ask you this. Yes. Excuse me for interrupting. Sure. Has the respondent forfeited his future right to seek judicial review of his treatment? He hasn't forfeited anything. But as I mentioned in my reply brief, we can nicely call him a detainee in a mental health facility, but the reality is he's incarcerated in penitentiary. And he's in a controlled population. He doesn't have access to all the nice office equipment that we have. He doesn't have a secretary or paralegal or a fax machine or a computer or anything else. I have no idea how much effort it took him to prepare that petition in the first place. And it's a very complete petition. It might be, to the trained eye, it's prepared by a layperson. It's not as well-crafted or as articulate as it might be. But it's got plenty of exhibits, and it lays out what his concerns were. And to say, too bad for you, Mr. Twining, you're going to have to do it all again, seems to be a waste of his time, a waste of the resources down there at Big Money. And, frankly, a waste of time from the attorney general's office because, presumably, if he were to recreate that document, the attorney general's office is going to file the same motion attacking it as was filed before. And their motion attacking it was pretty lengthy. And instead of wasting all those resources, simply send it back to the court and say, hold the hearing. You should have held before. That's my only point there. And the record doesn't say, by the way, include that, Ms. Snow or Mr. Glenn. It doesn't say that at all. It just says prepare the order. And if you look at the order, which is at C-327.4, is words that are scratched out. And if you look at it, it kind of looks like it says continue to and a date that wasn't put in. And then it says respondent withdraws motion for judicial review of treatment. And then down where it says approve, there's no initials or signing or anything. I submit. Was there an attempt to get a bystanders report? You said there was no record to determine what the court meant by that when he entered the order. No one requested a bystanders report because everything that was said on the record has already been transferred. Well, I'm talking about what may have been said off the record. My goodness. I have to tell you what. Something like that never occurred to me. I've never attempted to get a bystanders report of something that was said off the record. I apologize. That's a totally new one on me. Sometimes the court will have a conference with the attorneys that's not on the record. It's not transcribed. And then later you have to come back to find out what was actually said. We don't know, correct? That's an interesting thought. Well, we don't know, do we? No, we don't know. That's an interesting thought. I will note that the trial ended on July 11, and the order is handwritten and file stamped July 11, and there's nothing in the minute orders that say anything about an in-chambers conference or an off-the-records or a bench conference. So I submit to the court that the record says everything that was said, and the order was drafted and that was tossed in at the last moment. So that's all I have to say on that. Did you want to address the Masterson ruling? Yes. The Masterson ruling is, let me get to the correct part of my notes here if I may. Excuse me while I flip through my pages. I apologize. Okay. 23. Pages 23 and 24 and 25 of my brief are where I discuss Masterson, and that's really black-letter law from the Illinois Supreme Court, where the Supreme Court said in order for a person to be proven sexually dangerous, these are the four points that must be proven, and the court said there has to be an explicit finding of substantial probability that the person would engage in the commission of sex offenses in the future if not confined. That's at Masterson 207 L. 2nd 305 at 330. That was decided in 2003. The statute was amended somewhat in 2013, and if you look at the change, it looks like the legislature maybe someone was trying to finesse Masterson. Well, the inference is from our tools of statutory construction is that that was a response to Masterson, and that specific finding is now and was in the jury instruction in this case, correct? The jury found. It was one of many jury instructions. Well, the jury instruction required the state to prove by clear and convincing evidence that the defendant was substantially probable that the respondent will engage in the commission of a sex offense in the future if not confined. And that specific instruction as an element of being continuing to be sexually dangerous was in the jury instruction. Yes, about 15 pages of jury instructions were provided to the jurors. The point is that that instruction required the jury to make that finding in order to find that the defendant continues to be sexually dangerous, correct? That was the instruction to the jury, yes. And the presumption is that jurors follow the law, correct? That is the presumption, Your Honor. However, it wasn't included in the finding of the court. It wasn't included in the court order. It wasn't included in the verdict. And Peeple v. Bingham, which was decided by the Supreme Court after the amendment of the statute. Bingham was a bench trial, correct? I believe that it was, but neither Masterson nor Bingham limited its rulings to bench trials, and I haven't been able to find any cases other than one unpublished decision that has said that, which I can't even cite to it. I brought it to the court's attention because when I saw it, it was not yet denominated, you, unpublished. It's unpublished now. I checked on it the other day. And so there is one district court that's gone another direction in an unpublished decision, so I can't even know about it. So this court would be not. Well, you can know about it. You just can't cite it. Sure. I can't cite it, correct. Well, let me ask you this hypothetically. Sure. All right, defendant's on trial for residential burglary. The jury's instructed that the defendant, you have to find beyond a reasonable doubt, the defendant, when he entered the home, had the intent to steal or commit a felony there. But then the verdict form just says guilty or not guilty. Do we have to re-instruct the jury that they have to specifically find intent at the time of entry? I'm not aware of a Supreme Court decision that specifically speaks to that offense. Well, how about murder? I'm not. I mean, how about any type of offense where you have specific instructions on what the jury is required to find, but then you have a general verdict form? Well, Your Honor, actually all of that discussion is interesting from an intellectual standpoint. But number one, all of those are criminal cases where the person is being tried for the commission of a crime. Well, this is a case where there's a liberty interest at stake. The defendant's freedom is at stake here. Apparently my time is out. May I respond? Go ahead. In this particular instance, Your Honor, this is a quasi-civil proceeding in a weird sort of a way. And we're not trying to find that the defendant is guilty of anything. The jury or the court is supposed to find a variety of things, including that the person is substantially probable he won't engage in the commission of sex offenses in the future. And to date there is not a case that has said, well, the Masterson holding that was reiterated in Bingham, we're not going to apply it because this was a jury trial. There isn't a case. This case could be the first one. And if the court decided to do that, certainly that's your discretion. My alternative argument, which I'm not going to be able to address, is that there was substantial ineffective assistance of counsel throughout the hearing, and that if that had not occurred, it's our contention that the outcome would have been different. So that's an alternative. Do you want to summarize those points quickly? I have a question before she summarizes it. I believe in Bingham and probably Masterson it was an adjudication that the defendant was a sexually dangerous person. It wasn't a recovery proceeding. Is that correct? I believe that was true in Masterson. Bingham, I'm not sure. But then it was also reiterated in People v. Bailey and People v. Belanger, or Belanger, I'm sorry if I'm not saying that right, a Fifth Circuit, a Fifth District case just from 2018. And all of those possibly could have been bench trials, Your Honor. Well, my point isn't that it's a bench or a jury. My point is whether it's a recovery or an original adjudication. Well, I don't know why that would ñ I really don't see that there's a functional difference there, Your Honor, because the burden is on the state at every step. Well, if you establish somebody's an alcoholic, as opposed to establishing that someone was a recovered alcoholic but now has gone back and become an addict of alcohol, do you see the difference between the adjudication of addiction and the recovery or the recovery aspect where you've already been found to have been an addict? Yes, there's a huge difference. There's a huge difference. What is it? The person who submits the recovery application is presumed to no longer be a sexually dangerous person, and it is the burden of the state to prove by clear and convincing evidence that he remains that. So he has a presumption on his side. It's up to the state. The state has to prove that substantial probability. They have to prove it, and they have to prove it by clear and convincing. They don't have to prove it beyond a reasonable doubt because this isn't a criminal proceeding. And the alcohol situation, notwithstanding, we don't adjudicate alcoholics. So it's an interesting analogy. That was an analogy. It's an interesting analogy, and it's an interesting intellectual exercise, certainly. But because he's presumed under the law when he submits his application to no longer be sexually dangerous, and it's the state's job to prove otherwise, that's why. So I take your position to be that there is no distinction between a recovery proceeding and the original adjudication. I guess I've never actually thought about that. That's an interesting question. I think there are some quantitative differences, or maybe I should say qualitative differences, because at the time the person is petitioned to be a sexually dangerous person by the local state's attorney or whatever. I think – well, I have to say I haven't explored that issue because it hadn't occurred to me before. And Mr. – in this particular instance, Mr. Twain did appeal that 1995 adjudication, and he lost. So I really didn't delve into it, and I apologize for that. You raise an interesting point. I'm not sure that I would concede it because I haven't thought about it enough. Do you want to just summarize what your position is with respect to an effective system? Yes, and thank you for the opportunity. It's my position on behalf of Mr. Twining that if his trial counsel had departed from what has been called by the state her reasonable strategy to try to get the jury to focus on the here and the now, and if she had tried even once or even twice or even three times to stop the state from sensationalizing his criminal history, it would have made a huge difference. And the state knew without any question at all that the whole point – the whole point of detention under the law is treatment, not punishment. They said that in their motion in limine, number one. And yet they did everything they could to trot out every horrible, heinous thing he'd done dating back to 1965, 30 years before the matter that got him adjudicated as a sexually dangerous person. And they trotted it out not once and not twice but approximately five times in opening and closing – actually six times – opening and closing and through Dr. Clunch's testimony up to four times. Dr. Clunch just didn't say just a little bit. Dr. Clunch went into the nitty-gritty. By contrast, in her brief, Ms. McConnell summarizes Dr. Clunch's testimony and the entire state's argument in about a page and a half. It's concise and beautiful. Is there a rule that this type of testimony from an expert in a recovery proceeding cannot look into the facts of the defendant's prior history? No, not at all. Isn't that relevant to the jury's determination as to whether or not there is a foundation in what backs up the expert's report? Did he really have to describe the brutality of the 1965 rape up to four times to make the point to the jury? I submit it was sensationalistic. It made the jury horrified. He could have said what he needed to say in a much smaller amount of time. And also, the state could have requested certified convictions and allowed and requested Dr. Clunch to give the bare minimum. But as I cite in my brief, the jury didn't need to hear it many times. And unsophisticated jurors aren't going to understand the difference between foundation for an expert's opinion and gruesome criminal cases that are presented for substantive purposes. The jury was instructed to consider those facts only as the foundation for the expert's opinion, correct? Yes, I know that. And that's a nice legal fiction that we all indulge in. Why is it a fiction when an expert renders an opinion based upon a certain set of facts? Why is it a fiction? It's not a fiction. That's not what I said. That is not what I said, Your Honor. I apologize for correcting you. The fiction is that the jury is going to be able to always follow every instruction. And when the judge says all that stuff that you heard, you're only supposed to consider it for this purpose. They're human beings. That's why we have the whole rule about if it's marginally probative but it's very prejudicial, we're not going to use it because we recognize human beings are susceptible to prejudice. That's the crux of our entire argument is, yes, we know that Mr. Twining did horrible things. And if you look at his history, his probably worst crime was the one in 1965. And there were a few others. Well, I know that there's a catch-22 here with respect to treatment. But he does continue to have, at least according to Dr. Clomps, these fantasies about, for example, targeting or looking at a 14-year-old at a train station and fantasies about abducting her and raping her, living on an island, keeping women captive in cages to be essentially sex slaves. And that continues, correct? Well, I don't know if it continues to this day. He apparently did admit it, admit to such fantasies in therapy. And Dr. Myers, who testified on behalf of the defendant, said that's the point of therapy. People in therapy are supposed to get into their inner demons. They're supposed to bring them out so that the therapist can help them figure out how to deal with it. He said if a person in Mr. Twining's position was brought into therapy and said, no, I don't have any sexual fantasies, we'd call him a liar and we would be right. Everyone indulges in fantasies. Maybe some of our fantasies, some people could potentially have fantasies as terrible and appalling as Mr. Twining's. The difference between that person and Mr. Twining was, as a young man, he acted on some of those things. The fact remains judged. When he was let out in 2002 and returned in 2013, and there was a stint, he got returned because he failed to update his address. We can't forget about that. But in that nearly 11-year stretch, he did not commit any sexual assaults. There's no record that he was even arrested for it. Dr. Myers' opinion was, and it really reflects, although he didn't necessarily rely on Dr. Karich, what Dr. Karich said back in 2002, the defendant was starting to appreciate the terribleness of his actions and he was learning impulse control. That he has impulses is not illegal. That he previously acted upon them and got caught, sure. Terrible. And the fact that you just recited all of those horrible, lewd, lascivious things to me, you and I are both horrified by them. How do you think the jury felt? All they could think of was, this guy's a monster. We cannot find him. Well, you read too much into my comment. My comments are questions to you, not my personal observations. So your time is up. You'll have time for rebuttal. Thank you very much, Judge. May it please the Court. I'm Assistant Attorney General Erin O'Connell on behalf of the people. I wanted to start where my opposing counsel just left off, and that is on the issue of the state allegedly sensationalizing the details of his prior crimes. I don't think that's a fair characterization of the record here. Dr. Clouch did give a narrative description of what his prior acts were. He testified that he relied on the details of those offenses in rendering his opinion that he remains an SDP. The facts of the early crimes, the sexual assaults, the violent attacks, were that they went to the diagnosis of the otherwise specified paraphilic disorder premise on non-consenting victims. So where counsel said that there was repetition, there was an initial narrative of the facts, and then there was—he came back at page 290 of the record, and he went and asked, what did you rely on to render this diagnosis? He gave a list, and he referred back to the earlier events, and he said, I believe these events show that he is attracted to and has impulses toward non-consenting victims. What about the reference to the 1988 case where the defendant was actually acquitted, but the doctor introduced that testimony? It wasn't that error. He was acquitted of that offense. That's true. And the doctor ultimately said he didn't rely on that in rendering his opinion. Then why would he say it other than to prejudice the jury? He was— Why would the State, presumably, who interviewed the doctor and would have told the doctor, look, don't mention that? I mean, doesn't that lend some credence to the defendant's point that this use of these facts was intended to prejudice the jury against the defendant? I agree, Mr. Honor, that there is an error in admitting those details to the extent they were not part of the information he relied on in his ultimate opinion. So ultimately, that did turn out to be irrelevant. I can explain it as he was going through the narrative history of the arrests, of the convictions, and he did mention this as part of that. But ultimately, I do think his testimony that he didn't rely on it does mean that that was irrelevant to his testimony. But I would argue that any error there would be harmless because he did clarify, ultimately, that he wasn't relying on the offense resulting in an acquittal as part of his opinion that he remained in SEC. Counsel, you said that the iterations took place twice. The opposing counsel said it took place six times, once during opening, once during closing, and four times during testimony. So my question is, is it four times or two times that during his testimony he made reference to the specifics of the prior acts? I think it depends on which portions of the testimony that we're referring to. So I would say the details themselves were given once. Primarily here, that was in the narrative description of his history, and then there were brief references back to those offenses in explaining his opinions. So in addition to saying that this was relevant to the non-consent, I believe he referred back to the sexual assault in saying that he believed that he had demonstrated criminal propensities toward committing sex crimes. So that would have been a third reference. So there were times where he referred back to his earlier testimony, but he didn't go through the sort of lurid details of these acts over and over again in a manner that would have been designed to prejudice the jury. He did explain, he wove into his explanation of diagnoses, of the opinion that he remained in SCP, and that was proper that gave the jury an understanding of why he had earlier gone through these details, because he said the details of these offenses, the non-consenting aspect of these being sort of the trigger for this defendant, that was relevant to his paraphilic disorder diagnosis. It was relevant to his decision to, or his determination that he had demonstrated criminal propensities. So it did, it was brought up in different contexts is how I guess I would put it. On cross-examination of Dr. Klaus, referring to the score on the STATIC-99, he said in response to the defense counsel's, respondent's, attorney's question, so again, regardless of treatment or progress, he'll always have the same score, and the doctor said he'll always have the same score, yes. Does that mean that it's hopeless, he'll never be discharged? That is true of the STATIC instruments, and that's why they can never form the entire basis of an opinion on the risk to re-offend. They're based on historical facts. The only element that changes in those instruments is that you get some allowance when you reach a certain age. So that operates in his favor in that that has lowered his score somewhat, the fact that he is reaching an advanced age at this point. He got a three-point reduction because he was over the age of 60. But I think it's important, the experts always emphasize that it's not just the actuarial instruments that you need to focus on. That's kind of a baseline for an initial starting point of understanding his risk to re-offend. But the experts then go on to discuss the sort of dynamic factors that go more specifically to this particular respondent and that go to his own particular risk of re-offense. Certainly one of the most relevant factors here is the history and the fact that he had been released on conditional release twice. He had actually demonstrated twice an inability to comply with the conditions of that release. So that's not something that the static would necessarily fully account for. Something that had to do with his continued use of controlled substances. Correct. And that actually does go to his risk because the alcoholism was related in some ways to the earlier attacks. He did state that he was under the influence of alcohol. So it's a risk factor for his continued re-offense that he's continuing to use substances that sort of lower his inhibitions to commit these types of violent offenses toward the non-consenting victims. What is your position relative to Ms. Augsburger's position regarding a remand for addressing the petition that the trial court struck without apparently anything in the record to indicate a basis for that striking? I agree. There's a lot of ambiguities as to how that made its way into the order. But there was no prejudice from this finding because he can refile the motion at any time in the trial court. So he doesn't need this court to find that this was error and vacate and remand for further proceedings. He can literally file the same motion again in the circuit court today and have proceedings on his motion for judicial review of treatment. So that would be my comment on that. We don't dispute that he's entitled to that sort of judicial review if he has a legitimate complaint about it. I don't know the full circumstances. The record doesn't reflect exactly why he withdrew it at this time. It sounds like you're saying that he wasn't prejudiced regardless because he can refile it at any time. That's correct. Well, why should he have to refile it? Why don't we just remand it and we start all over again? It seems to me it seems if someone is institutionalized and I believe he is confined to a wheelchair, maybe he isn't, but there are actually special rules for people in institutions against their will relative to giving them some, for want of a better term, some special privilege because they aren't able to walk or drive or get to the courthouse or maybe even pay for someone to do it. Why isn't this a prejudice if, in fact, he's going to – if he has the right to file what he already filed, why should we just remand it? If the court feels that's the most efficient way of addressing the issue, we don't have a strong objection to that because he does have the right to pursue the judicial review of treatment if he would like to. I would say in terms of the burden on him and the trial court, he could ask to reinstate the initial motion again today and have that proceeding go on. So he doesn't need a remand from this court, but certainly because he has the right to this sort of review, the state doesn't have a strong objection to it. Did the doctor specifically testify that there was a probability of a sexual contact offense in his opinion? Of a future sexually violent offense? In other words, did the doctor testify relative to the parameters that were set out in Bingham and Masterson that related to the probability of a repetition of a sexual contact offense? He did, and he gave an opinion on specifically that he is substantially probable to reoffend, meaning – and I believe he even defined it as much more likely than not. If the court wants to get into the transition into the Masterson issue, the jury instructions ultimately amount to an explicit finding on this record that he had a substantial probability to reoffend. So unlike in a bench trial where the court doesn't necessarily recite the legal standard before making findings, here we know that the jury knew that it had to make that finding in order to return the verdict that it did. It's not quite in my opinion you're right. The instruction indicates that the jury was instructive. My question was relating to whether or not he actually said the magic words. He did, yes. All right. Simon says, what is your response to my questions regarding any distinction between a recovery and original adjudication? There is precedent that has applied the Masterson finding to a recovery proceeding, so that would be bailing. It is an extension of Masterson that the Supreme Court has not yet taken to do that. We didn't raise the point here because those cases seem to be so distinguishable on the basis that they're bench trials, whereas we had a properly instructed jury here. But if the court were to find that it doesn't apply to a recovery proceeding, I believe that would create sort of a direct split with the Bailey decision. But I wanted to address the Fourth District's decision in Kalal. I believe this remains a published decision. It's listed as an unpublished now on the Supreme Court website. Oh, it is. So I know it was initially unpublished, and the state moved to publish it, and then it was published, but I don't know that there was further activity. I looked this morning, and it did have a U, but that does not mean that may not change. It could be that it's in both places because it was published as a U. I mean, it wasn't published. In any event, as of this moment, it is unpublished. That may be the case. I also wanted to alert the court that there was a PLA filed in that case on this precise issue of whether Masterson can be met in a jury trial by the instructions in the general verdict. So that topic, it was, I believe, filed in May and would be up for review in the September term, so that could be coming very quickly, a decision on whether the court's going to actually review that issue. So you're representing now that you learned that it is a published decision? That's my understanding. I don't want to misrepresent to the court that I didn't follow up. If it's a recent thing that it was retracted and unpublished, I don't want to deny that that's the case. It was my understanding, though, that it was unpublished and then pursuant to a motion by the people was published. So that is my understanding of why there were the two citations, the one with the U and the one without the U. But if the court would like, I would be happy to. Well, I would certainly do it. Right. Or my colleagues will. But the court can, I mean, to the extent it's not, cannot be relied on as press. We can review. We will review. We have reviewed it. Right. It's persuasive reasoning that the court can adopt in its own decision in this case. But it is a fairly unsettled area. And so there are potentially future developments very soon as to this issue. Is this man bound for wheelchair, do you know, or not? My opposing counsel might be able to respond to that in rebuttal. I'm not entirely clear on that. I do know that he does have, he is ailing. According to the doctor's counsel's testimony, he is ambulatory, but he occasionally uses a wheelchair. Right. And he has health issues. He does have health issues, significant health issues. And so I don't know if it's gotten to the point where he can't ambulate at this point. I'm just not sure of that. But he definitely has restrictions on his movement, and occasionally at least uses a wheelchair. Do you want to address the counsel's argument that the respondent's counsel was ineffective for failing to object to numerous references to the defendant's past? So I have two responses to that. Go ahead. The first one was I think it's necessary to just clarify that in the record, there wasn't really an area where counsel would have had a valid basis to object. So the expert went through it once, and the details, there's no valid objection if he's relying on this in his opinion. And then the brief references back to that were not really opportunities that would have been presented for counsel to object at that point. But I did also want to emphasize that counsel clearly had an overarching strategy in this case, which is from counsel's opening statement to the closing argument, not to deny the fact that he had committed really horrible crimes. There was a risk that in objecting to this testimony, counsel would seem to be sort of minimizing the facts of those prior acts. I do believe that that was maybe strategic on counsel's part, not to be seen as continuing to object to the expert's recounting the facts of his offenses. I think that was a justifiable strategy here. Counsel did try to and sought to have the State prove the background by certified convictions, correct? In terms of a pretrial motion, I don't believe there was one. Okay. In terms of the State admitted one conviction as substantive evidence of the propensities. The rest of this was only admitted as basis for the expert opinion. And, of course, the jury was instructed to use it in that fashion, and we do presume that they followed the instructions. But I would just emphasize that this was all of a piece with counsel's strategy, which was to not deny that horrible thing that happened, but to emphasize that they were far in the past and that circumstances had changed for this respondent and that the substantial probability element could no longer be met. And counsel's overall performance was, of course, effective. She did produce an expert to testify to that effect. So we would ask the court to affirm the judgment of the trial court. Rebuttal. And I would like to start by saying to Justice Brucken, I apologize. I wasn't attempting to or intending to say that you were offering personal observations. You selected portions of the record which are pretty spectacular, and you and I and everyone in this room and everyone in that room, too, would recoil at all of them, and that was my point. So I apologize. Well, believe me, it's not my first dance. I've seen a lot of horrific things. Well, certainly, given your professional legal history, I'm sure that that is true. I appreciate very much that the court recognizes that Dr. Clunch should never have been allowed to say anything about the 1988 case, and the sole purpose of him talking about it must have been not for him, but it must have been trial strategy from the other side, that let's get this in front of the jury along with everything else. Counsel, you admit in your brief, do you not, that much of the information that was produced in this trial was, in fact, it had some probative value? It had some probative value. Including the information you're objecting to now, is that correct? Yes, it has probative value, no question. And I would refer the court to People v. Anderson, the Supreme Court decision from 1986 that I quote in my brief. The issue there was insanity, but the contents of the reports relied upon by the doctor would be clearly inadmissible if offered for their truth. They weren't being offered for that. The Supreme Court said it's true that an uninformed jury could misuse this type of information as substantive proof of insanity. That was the issue there. And the court went on to say, a limiting instruction advising the jury to consider the underlying statements only to evaluate should have forestalled any misuse. Well, maybe, I don't know. And then it said a trial judge, of course, need not allow the expert to recite second-hand information when its probative value in explaining the expert's opinion, there is some, pales beside its likely prejudicial impact for its tendency to create confusion. And I would point the court just as the bell rang and the horses were let out of the gates, at R-246, 247 and on, Mr. Glenn representing the Statehood, you may be wondering what a sexually dangerous person is. I can tell you right now, he's sitting right over there, and then he proceeded for the next two and a half pages to regale the jury with every, as Ms. McConnell says, lurid detail in opening argument. Then when Dr. Clunch was put on the stand, he was asked to, and did describe in explicit detail on pages 272 to 274, just as an introduction. Then he offered explicit details about the 1691 conviction. Then a second time he was asked about all of these things. Well, you've read all of this stuff, you've reviewed all of it. What's your diagnosis? Offers his diagnosis. What did you rely on? He says it all again at 288 to 296. Then the State asked him a series of questions about risk assessment. So you reviewed it, and you talked all about it, and you've reached a diagnosis, and you talked all about it. Have you done a risk assessment, Dr. Clunch? Well, yes, I have. He was given the opportunity to reiterate all of those details again on 296 to 316. Finally, the State asked him a series of questions about his conclusions, and he offered everything again. Pages 3... Counselor, could you tell me why Defense Counsel didn't say objection, Your Honor, or ask an answer? How can I possibly know? She should have. Well, opposing counsel suggested it was strategy. Do you want to respond to that? Even if it was strategy, just saying that strategy was employed isn't a magic wand that says, well, if there was some strategy, then surely it wasn't ineffective assistance of counsel. The poorest attorney can have a theory of the case. The poorest attorney can have a strategy. I'm not saying Ms. Isley was a poor attorney. I'm saying Ms. Isley inexpertly and ineptly represented this gentleman, and she could have filed a motion in limine. In her response to Motion in Limine No. 1, to its first paragraph, she didn't object to Dr. Clinch's testimony, but she said, I would note that all of these details of his convictions could be prejudicial to him. She recognized it in her response, and then when they had their hearing on the motion in limine back in April of that year, the judge said, I take it you don't object to this paragraph, and she said, no, other than to note the prejudice that could relate. Of course, I'm not quoting her exactly. She was aware that Dr. Clinch's testimony was going to be prejudicial. I just refer the Court to the exhaustive discussion in both my brief in chief, the response and the reply brief, paying special attention to the facts of the 2002 case. I think it's instructive. It's not binding, but it certainly is instructive, and I thank Your Honors very much for allowing me to be here today. I ask that you reverse the court order, reject the jury verdict, and return the case for a full hearing. Thank you, Your Honors. Thank you. The Court thanks both parties for their arguments today. The case will be taken under consideration. A written decision will be issued in due course. The Court stands adjourned for the day. Thank you.